**A F F I D A V I T**

STATE OF WEST VIRGINIA

COUNTY OF CABELL, to-wit:

I, Georgia Marshall, being first duly sworn, do hereby depose and state as follows:

1. I make this affidavit in support of an application for a search warrant to authorizing the examination of the two electronic devices, an Apple iPhone and a TCL phone, (hereinafter "CELLULAR PHONES") described in Attachment A which are currently in law enforcement possession, and the extraction from that electronic device of electronically stored information described in Attachment B. The CELLULAR PHONES were used by JOSHUA MCCARVER (hereinafter "MCCARVER"). As set forth herein, probable cause exists that MCCARVER has committed violations of 21 U.S.C. § 841(a)(1) – distribution and possession with intent to distribute controlled substances and 21 U.S.C. § 846 – conspiracy to distribute controlled substances (hereinafter the "SUBJECT OFFENSES"). Furthermore, probable cause exists that evidence of those offenses is currently located within the CELLULAR PHONES more particularly described in Attachment A.

2. I have been a Special Agent with the Federal Bureau of Investigation (hereinafter the "FBI") since 2019. I am a graduate of the FBI Training Academy in Quantico, Virginia, where I received training in controlled substance investigations, white-collar crime, cyber-crime, crimes against children, interviewing, interrogation, evidence

collection, intelligence analysis, and legal matters, among other topics. I have been an Affiant on multiple federal search warrants and Title III affidavits. I am currently assigned to the Huntington, West Virginia Resident Agency of the Pittsburgh Division. Prior to my current assignment, I was a Special Agent with the Air Force Office of Special Investigations from 2015 to 2019 where I investigated federal offenses committed by Air Force members and/or offenses committed on Air Force installations. I have experience investigating complex drug trafficking organizations, firearm violations, and child exploitation offenses, as well as other violations of federal law. As a Special Agent, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7).

3.   I have obtained the facts set forth in this Affidavit through my personal participation in the investigation, from oral and written reports of other law enforcement officers, from records, documents and other evidence obtained during this investigation, and from other sources of information as referenced herein. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

### PROBABLE CAUSE

#### Background of the Investigation

4.   The FBI Huntington TOC West Task Force (hereinafter "the Task Force") has been conducting a criminal investigation into MCCARVER and others participating in an extensive DTO involved in the commission of the SUBJECT OFFENSES. MCCARVER, and other individuals, both known and unknown to investigators at this time, frequently obtain large quantities

of methamphetamine and fentanyl, both Schedule II controlled substances, from one or more sources, and distribute those drugs in and around Huntington, West Virginia, and other locations within the Southern District of West Virginia. Members of the DTO include, but are not limited to, MCCARVER, DARNELL MCCARVER (hereinafter "D. MCCARVER"), TRISTAN HUFFMAN (hereinafter "HUFFMAN"), WILLIAM JOHNSON III (hereinafter "JOHNSON"), LAMARR WELCH (hereinafter "WELCH"), and JAMES GARDNER (hereinafter "GARNER"). MCCARVER predominantly supplies the DTO members with controlled substances for distribution. MCCARVER, and sometimes D. MCCARVER, will direct customers to the various other members of the DTO to obtain controlled substances. Over the course of the investigation numerous investigative techniques have been used including physical surveillance, controlled purchases of controlled substances, utilization of phone geolocation data, and traffic stops.

5. Since July of 2024, there have been over thirty controlled purchases of controlled substances from MCCARVER or one of the DTO members. All the controlled purchases were conducted by various Confidential Human Sources, (hereinafter "CHS"), all of whom have been assessed to be reliable and have provided corroborated information regarding drug trafficking in the Southern District of West Virginia.

6. MCCARVER utilizes telephone number (313) 986-6081 to facilitate controlled substance transactions. Over the course of the investigation, specifically since February 2025, United States Magistrate Judge in the Southern District of West Virginia Joseph K. Reeder signed various search warrants to collect the geolocation ping data from MCCARVER's telephone.

7. On February 7, 2025, members of the Task Force conducted a controlled buy operation on MCCARVER that was conducted by HUFFMAN at 149 ½ Baer Street, Huntington, West Virginia. Investigators met with a CHS, where a search of the CHS was conducted and all applicable paperwork completed. The CHS had previously spoke to MCCARVER via text message on telephone number 313-986-6081 to arrange the transaction. The purchase was for two ounces of methamphetamine for $350. The CHS was driven to the 100 block of Baer Street and dropped off. The CHS was observed walking into 149 ½ Baer Street. Several minutes later the CHS was observed exiting 149 ½ Baer Street and returned to investigators.

8. Once with investigators, the CHS turned over a knotted plastic bag containing approximately 53.5 grams of a crystal-like substance that later field tested positive for methamphetamine. A search of the CHS was conducted with no contraband found and debriefed. During the debrief the CHS advised that the transaction occurred with HUFFMAN, a runner for MCCARVER. A review of the buy video confirmed the CHS's statement.

9. On March 17, 2025, a traffic stop was conducted by officers with the Ohio State Highway Patrol of a Buick with Tennessee registration BSB3308. The driver was identified as HUFFMAN, and the other occupants were identified as JOHNSON and MCCARVER. During the traffic stop, HUFFMAN told officers that he, JOHNSON, and MCCARVER were traveling to Detroit, Michigan. A search of the vehicle provided approximately $27,951 in US Currency.

10. On July 7, 2025, members of the Task Force conducted a controlled buy operation on MCCARVER at 5400 Altizer Avenue, Lot 7, Huntington, West Virginia. Investigators met with a CHS, where a search

4

of the CHS was conducted and all applicable paperwork completed. The CHS had previously messaged MCCARVER utilizing telephone number (313)986-6081 to arrange the transaction. The transaction was for a quarter pound of methamphetamine for $700. The CHS was dropped off in the area 5100 block of Altizer Avenue, Huntington, West Virginia. The CHS walked eastbound and entered a Ford Explorer with Ohio registration KPL7322 (hereinafter "the Explorer"). The Explorer turned south onto 13th Street. Several minutes later the CHS was observed by investigators walking westbound on Altizer Avenue from 13th Street. The Explorer was observed traveling eastbound on Altizer Avenue and pulling into the driveway of Lot 7. MCCARVER exited the driver's door of the Explorer and entered Lot 7. The CHS returned to investigators.

11.  Once with investigators the CHS turned over a knotted plastic bag containing approximately 112.5 grams of field test positive methamphetamine. A search of the CHS was conducted with no contraband found. During the debrief the CHS provided that the transaction occurred with MCCARVER inside the Explorer. A review of the buy video confirmed CHS's statements.

12.  On July 9, 2025, a traffic stop of the Explorer was conducted after the vehicle was transiting from West Virginia through Ohio. Investigators believed the occupants to be traveling back to Detroit, Michigan. The Marion County Sheriff's Office conducted the traffic stop of the Explorer in Marion County, Ohio. ASHELY DONEFF, a known associate of MCCARVER, was identified as the driver of the Explorer. Also inside the vehicle were JOHNSON, HUFFMAN and MCCARVER. A search of the vehicle provided approximately $23,453.25 in US Currency. DONEFF was

5

subsequently arrested based on a previous arrest warrant out of Ohio. During the stop, JOHNSON informed officers that he was traveling back to Detroit, Michigan to then fly to Miami, Florida. A review of the US Currency seized from the traffic stop provided $650 of the $23,453.25 matched the serial numbers of the prerecorded buy money from the aforementioned controlled buy completed on July 7, 2025, by MCCARVER.

13. An Administrative Subpoena was submitted to Apple regarding MCCARVER's identifiers, such as his first and last name, date of birth, Social Security Number, to ascertain his Apple accounts. An Apple iCloud Account was found listed under the registered name of "Joshua McCarver". The mailing address listed for MCCARVER's Apple iCloud Account was 18822 Healy St, Detroit, Michigan. MCCARVER's phone number, (313) 986-6081, is not believed to be an iPhone by investigators and was not listed on MCCARVER's Apple iCloud Account. In my training and experience it is common for drug traffickers to utilize various cell phones and communication platforms in an effort to compartmentalize aspects of their DTO. MCCARVER specifically utilizes the telephone associated with phone number (313) 986-6081 to contact the CHS. However, at times he utilizes an Apple device to contact members of his DTO to further facilitate controlled substances movements and transactions. Specifically in a controlled purchase on April 9, 2025, the CHS was present inside 149 ½ Baer Street, when WELCH and MCCARVER were talking to each other over FaceTime about the amount of drugs inside the Baer Street residence for distribution.

14. On August 7, 2025, members of the Task Force conducted a controlled buy operation on MCCARVER that was conducted by JOHNSON at

5400 Altizer Avenue, Lot 7, Huntington, West Virginia. Investigators met with a CHS, where a search of the CHS was conducted and all applicable paperwork completed. The CHS placed a recorded call to MCCARVER utilizing telephone number (313)986-6081 to arrange the transaction of a quarter pound of methamphetamine for $650. The CHS was dropped off in the area of 200 13th Street in Huntington, West Virginia. The CHS walked eastbound and approached Lot 7. The CHS entered Lot 7 and several minutes later exited Lot 7 and returned to investigators.

15. Once with investigators the CHS turned over a knotted plastic bag containing approximately 112 grams of field test positive methamphetamine. A search of the CHS was conducted with no contraband found. During the debrief the CHS provided that the transaction occurred with JOHNSON, a runner for MCCARVER. A review of the buy video confirmed CHS's statements.

16. A review of the geolocation data associated with MCCARVER's telephone have provided since May 1, 2025, through September 8, 2025, the phone has transited from Detroit, Michigan to Huntington, West Virginia and back multiple times.

17. On September 9, 2025, MCCARVER was indicted by a Federal Grand Jury in the Southern District of West Virginia for violations of 21 U.S.C. § 841(a)(1) – the distribution of 50 grams or more of methamphetamine and a quantity of fentanyl, and 21 U.S.C. § 846 – conspiracy to distribute methamphetamine and fentanyl.

18. On September 10, 2025, MCCARVER was located and arrested as he exited an apartment building in Jackson, Michigan. MCCARVER provided consent to search the apartment he exited, at 2731 Granada Drive,

Apartment 1-D, Jackson, Michigan. Upon searching the apartment, the CELLULAR PHONES were located and seized.

19. The CELLULAR PHONES were initially logged into FBI evidence in Detroit, Michigan before being transferred to the Charleston Resident Agency FBI evidence room. The CELLULAR PHONES and are currently located at 113 Virginia Street East in Charleston, West Virginia.

20. In addition, based upon my experience and training, consultation with other law enforcement officers experienced in drug and financial investigations, and all facts and opinions set forth in this affidavit, I know that:

   a. It is common for unlawful distributors of controlled substances to use wireless telephone to send and receive text messages with other distributors and/or customers and maintain contact lists within wireless telephones to facilitate their unlawful drug activities;

   b. It is common for unlawful distributors of controlled substances to use wireless telephones for the following reasons, including: 1) to arrange unlawful drug transactions; 2) to facilitate unlawful drug transactions; and 3) to communicate with other members of their unlawful drug organizations concerning matters related to their unlawful drug activities;

   c. It is common for unlawful distributors of controlled substances to coordinate with their source(s) of supply and other members of the drug organization through the use of wireless telephones. Wireless telephones are particularly valuable to unlawful distributors of controlled substances to facilitate their

unlawful activities because of a common belief that law enforcement has greater difficulty "tracking" wireless telephones and monitoring conversations over wireless telephones than traditional land-line phones. In addition, wireless telephones can be disposed of easily and this fact emboldens unlawful distributors of controlled substances to use such portable devices to facilitate their unlawful activities. This is particularly true in cases when the "source" city where the controlled substances are obtained is different than the city where the controlled substances are distributed. In such cases, based on the distance between the source city and the distribution areas, members of the organization generally cannot meet at a common destination and engage in face-to-face conversations to coordinate and conduct drug-related business;

d. It is common for unlawful distributors of controlled substances to store persons' names and their corresponding phone numbers, and addresses of those who are involved in their drug trafficking operations in wireless telephones' contact list;

e. It is common for unlawful distributors of controlled substances to maintain photographs and video on wireless telephones that capture members of the unlawful drug organization, members of the unlawful drug organization in the presence of drug proceeds, and members of the unlawful drug organization in the presence of firearms used to facilitate their drug trafficking activities. Many of the aforementioned photographs and video are considered "self-aggrandizing" portraits where unlawful distributors of controlled

substances pose with United States currency to demonstrate the prosperity of their unlawful drug activities and pose with firearms to demonstrate the "fire-power" they possess to facilitate their unlawful drug activities; and,

f. It is common for unlawful distributors of controlled substances to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of narcotics proceeds, as well as notations and records of their drug transactions. This information is maintained by the narcotics traffickers within their residences, or other locations, which they maintain dominion and control over, including wireless telephones.

21. The CELLULAR PHONES are currently in storage at 113 Virginia Street East, Charleston, West Virginia, 25301. In my training and experience, I know that the CELLULAR PHONES have been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the CELLULAR PHONES first came into the possession of the FBI.

## TECHNICAL TERMS

22. Based on my training and experience, I use the term "wireless telephone" to convey the following meanings: a wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made

to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; mobile applications that enable users to perform various functions such as online messaging, sending videos and photos; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

23. Based on my training and experience I know that the CELLULAR PHONES have capabilities that allow it to serve as wireless telephones. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

24. Based on my knowledge, training, and experience, I know that wireless telephones can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on wireless telephones. This information can sometimes be recovered with forensics tools.

25. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes

described on the warrant, but also forensic evidence that establishes how the CELLULAR PHONES was used, the purpose of the use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the CELLULAR PHONES because:

    a. Data on a wireless telephone can provide evidence of a file that was once on a wireless telephone but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a wireless telephone can also indicate who has used or controlled the wireless telephone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    b. A person with appropriate familiarity with how a wireless telephone works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how a wireless telephone was used, the purpose of its use, who used it, and when.

    c. The process of identifying the exact electronically stored information on a wireless telephone that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a wireless telephone is evidence may depend on other information stored on the wireless telephone and the application of knowledge about how a wireless telephone behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    d.    Further, in finding evidence of how a wireless telephone was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a wireless telephone.

26.    Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

27.    Based on the above-stated information, probable cause exists that MCCARVER has engaged in an on-going series of drug trafficking activities including the SUBJECT OFFENSES. Probable cause further exists that evidence of those offenses are currently located on the CELLULAR PHONES, as more fully described in Attachment A.

28.    Further your Affiant sayeth naught.

_____
GEORGIA MARSHALL, SPECIAL AGENT
Federal Bureau of Investigation

SUBSCRIBED AND SWORN before me by telephonic means this 16 day of September 2025.

_____
HONORABLE JOSEPH K. REEDER
United States Magistrate Judge